Ronald FURR, Charles Spriggs, John Hunter, William H. Morris, Walter Oliver, Sylvester Scott, Plaintiffs,

v.

## TRANS WORLD AIRLINES, INC., Defendant.

### No. C–1–76–589.

United States District Court, S. D. Ohio, W. D.

Sept. 5, 1978.

John J. Getgey, Jr., Cincinnati, Ohio, for plaintiffs.

John A. Lloyd, Jr., and Barbara Bison Ford, Cincinnati, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID S. PORTER, District Judge.

This is an individual disparate treatment suit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Plaintiffs are six black former TWA skycaps at the Cincinnati Metropolitan Airport. Defendant Trans World Airlines, Inc. (T.W.A.), is a Delaware corporation authorized to do business in Ohio and is an employer within the meaning of 42 U.S.C. § 2000e(b). Plaintiffs have charged defendant with discriminating against them on the basis of their race. Plaintiffs seek injunctive relief, back pay, special damages and other appropriate relief on their own behalf. The case was tried to the Court on July 17 and 18 of 1978 and we now enter the following findings of fact and conclusions of law in accordance with Fed.R.Civ. Pro. 52.

Plaintiffs in this case sought and obtained jobs with TWA as skycaps in the following years: Morris—1958; Hunter—1966; Spriggs—1966; Furr—1966; Scott—1968 and Oliver—1971. There is no evidence that plaintiffs were discriminated against with respect to their initial hiring or that they had even sought any other type of employment with TWA.[1] Furthermore, this Court cannot find that the skycap positions plaintiffs held were inferior since plaintiff Furr testified that, as a skycap, he earned $80 to $90 per day in tips in addition to his regular salary.[2] In fact, there was no evidence presented of any past discrimination on the part of the defendant either with respect to its hiring policies or with respect to the establishment of the departmental seniority system at issue in this case.[3] Although plaintiff Furr testified that it was his impression, after travelling to seven of the sixteen cities at which TWA maintained skycap operations,[4] that the skycaps were "virtually all black," plaintiffs presented no statistics on this issue. Nor did plaintiffs present any statistics concerning the racial composition of other TWA departments, TWA's applicant pool, TWA's new hires by department or the racial composition of the Cincinnati metropolitan area. The only accurate statistical evidence on the racial make-up of any of TWA's employees presented in this case is that agreed to by the parties—*i. e.,* that at the time of the termination of the TWA Cincinnati skycap operation in March of 1974 there were eleven black and one white skycap. It was this group to which the plaintiffs belonged and whose termination caused the problems of which plaintiffs now complain.

## I. THE SKYCAP TERMINATION

The facts of the termination appear to be as follows: In 1974, TWA was preparing to move into the renovated Cincinnati airport.

1. Plaintiff Hunter testified that the only position he applied for was as a skycap. There was evidence that plaintiff Furr had sought a position as a Quality Control Technician and as a Ticket Agent but this appeared to have taken place in 1970 as opposed to 1966 when he was originally hired.

2. Based on a five day work week, this figure translates into an annual income of $23,400 in tips.

3. *See* pp. 69–70 *infra* and *Quarles v. Philip Morris, Inc.,* 279 F.Supp. 505 (E.D.Va.1968). *See also United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558 n. 10, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 346 n. 28, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

4. The cities were New York, Chicago, Philadelphia, Los Angeles, San Francisco, Dayton and Denver. At the time of the Cincinnati termination in 1974, TWA had skycap operations in sixteen cities. DX 7, at 4.

In connection with this move, TWA reviewed its skycap operation. Prior to the renovation, the arriving and departing passengers for all airlines passed through one large area in the terminal. At that time, TWA had provided skycap services for all the other airlines (except American Airlines) and the other airlines had reimbursed TWA for these services. In the renovated airport, however, TWA would be sharing a terminal facility with American Airlines separate from the other airlines. Thus, it no longer seemed feasible to provide skycap services for the other airlines. Mr. Edward F. Camerrer, the Manager of TWA Customer Services in Cincinnati, testified at trial that in January of 1974 he had received a proposal from American Airlines to consolidate their skycap services with TWA if the contract for these consolidated skycap services went to Allied Aviation Service Company of Kentucky, Inc. Mr. Camerrer testified that in February, 1974 he recommended to TWA regional officials that the American proposal be accepted due to substantial cost savings. In early March, 1974, Mr. Camerrer's recommendation was approved with a scheduled effective date of May 19, 1974.

The evidence next demonstrates that a meeting was called on March 22, 1974 to officially inform the twelve TWA skycaps of this decision and, according to TWA, "to explain to the skycaps their rights and privileges under TWA policies" (doc. 23, at 13–14). The parties are in disagreement over who initiated the request for a meeting—plaintiffs contend that, because of rumors they heard concerning the new Allied contract[5] they went to management to ask for an explanation while defendant reiterates that due to its concern for the skycaps, TWA called the meeting in order to fully explain the benefits available to the skycaps as TWA employees. In any case, it appears that a meeting between TWA management personnel and the skycaps was held on March 12, 1974 and Mr. Robert Kaps, who is responsible for regional labor relations, flew in from Kansas City, Missouri (his base of operations) to conduct the meeting.[6]

The parties are in sharp disagreement over what took place at that meeting. All parties, however, agree that the skycaps were officially informed at that time that their positions had been terminated. The primary topic of discussion also appears to have been the TWA "system displacement policy." This policy was designed to allow a furloughed TWA employee to exercise his seniority on the entire TWA system and "bump" the most junior employee within his job classification while, at the same time, keeping the number of these displacements to a minimum—i. e., to protect the employee with seniority while at the same time avoiding what Mr. Kaps characterized as a "bump and roll" by which a single placement could set off a chain reaction akin to a column of toy soldiers being "bumped." The operation of the TWA "system displacement" policy is illustrated by defendant's exhibit No. 1 (attached to this Opinion) which in all material respects is similar to the chart drawn by Mr. Kaps on the blackboard at the March 22 meeting to assist the skycaps in understanding the operation of the system.

The TWA "system displacement" policy operates as follows: Upon receiving his furlough notice, a TWA employee must inform his supervisor of his desire to exercise his system displacement rights and of the cities he desires to transfer to in order of preference. An employee may list any number of cities or he may simply list "any station." If an employee lists a specific number of locations and he is successful at picking a location where the most junior employees are located, he will automatically transfer to that station (DX 1, Employee "A" exam-

5. Mr. Walter Oliver, one of the plaintiffs, testified that he had heard in February of 1974 through the brother of a relief worker that "TWA signed the contract with Allied two months ago." The testimony of the other plaintiffs is consistent with this story.

6. Mr. Robert Waldren, the Supervisor of the Airport Ticket Office (ATO) in 1974 testified that he attended this meeting but did not address the skycaps then. He apparently did have some discussions with them later about the termination which were general in nature.

ple). On the other hand, if he fails to pick a location where the most junior employees are located, he will be automatically furloughed with layoff pay (DX 1, Employee "B" and "E" examples). Finally, an employee may list "any station" in which case he will automatically transfer to any station at which the most junior TWA employees in that job classification are located (DX 1, Employee "C" and "D" examples).

■ At trial, Mr. Kaps testified that he encouraged plaintiffs to list "any station" because he felt it likely that they would "bump" into a skycap position in another city. Plaintiffs, however, contend that Mr. Kaps placed a limit on the number of cities they could select (alternatively referred to as a limit of either three or five cities)—unless they selected "any station," in which case the system would operate as outlined above. This Court finds plaintiffs' contention unrealistic and concludes that any misunderstanding on plaintiffs' part concerning the number of cities they could select arose either out of plaintiffs' desire to select stations close to the Cincinnati area[7] or a misinterpretation of the blackboard chart which listed five examples (see DX 1), and not out of any misrepresentation made by Mr. Kaps or any other TWA official concerning plaintiffs' seniority rights.

■ Plaintiffs' primary objection to the operation of the TWA "system displacement policy" was that it forced them (in the words of their counsel) to make a "blind choice" because TWA would not provide them with a list of the locations of the most junior skycaps. Plaintiffs' evident fear was that, if they did not choose a location at which the most junior skycaps were located, they would automatically be furloughed (DX 1 Employee "B" and "E" examples).

In order to make an intelligent choice, therefore, plaintiffs wanted a list of these locations. It is undisputed that they requested such a list and that TWA failed to provide them with one. At trial, TWA presented several explanations as to why such a list was not provided. First, it was not TWA policy to provide their non-contract employees with such a list. There was no evidence at trial that TWA had ever provided any of its non-contract employees with such a list.[8] Second, at the time of the meeting in 1974, TWA would have had to have prepared such a list manually by collecting information from all sixteen locations where TWA skycap operations existed.[9] Finally, and most importantly, there was testimony at trial that if TWA had provided such a list in March, 1974, it would have been of little use to plaintiffs in any case because such a March list would not have accurately reflected the seniority situation in May of 1974 when plaintiffs were due to be furloughed. In other words, any changes in the personnel at the TWA skycap operations across the country between March and May would have rendered a March list misleading and out of date. It is undisputed that plaintiffs knew the locations where TWA had skycap operations and that a list of those locations was provided them at the March meeting. DX 7, at 4.

■ Plaintiffs, however, make certain additional contentions concerning their furlough, recall and transfer rights under the Management Policy and Procedure Manual (MP&P), the company manual governing the employment rights of all of TWA's non-contract (i. e., non-union) personnel. (See PX 1; DX 8.) First, plaintiffs contend (and defendant does not dispute) that Mr. Kaps advised plaintiffs to exercise their seniority displacement rights on the TWA system

---

7. Mr. Kaps testified that the "issue of three cities" did come up at the March 22 meeting but in the context of plaintiffs' desire to transfer to either Columbus, Dayton or another station in the Cincinnati area.

8. In contrast, TWA was apparently obligated under the terms of its collective bargaining agreement with the International Association of Machinists (IAM) to provide such a list for

its contract (union) employees. See JX 1, at 35–36; DX 6, at 33–35; DX 5 at 14.

9. There was testimony at trial that, due to the computerization of TWA's employment records, such a list can now be compiled in a matter of minutes at the press of a button. This technology, however, was apparently not in use in early 1974.

since their only other option was to be furloughed from the TWA Cincinnati station—an impractical option since the termination of the TWA Cincinnati Skycap operation would mean that there would be no skycap jobs to be recalled to. Plaintiffs, however, go on to claim that Mr. Kaps did not explain the possible advantages of accepting furlough status.[10] We find this claim untenable in light of the testimony and documentary exhibits presented (DX 7, at 1; July 18 testimony of Robert Kaps).

Plaintiffs next contend that Mr. Kaps did not advise them of their recall rights under MP&P § 10.49.06. That section, in pertinent part, reads as follows:

G. RECALLS AND RESTORATIONS

1. When vacancies occur or forces are increased by a major department in the metropolitan area, in a classification from which employees were reduced, furloughed, or relegated to other than original status, all such affected employees will be offered restoration or recall in the reverse order in which they were affected, for a period of two and one half years from the date of the action which affected them.

2. A furloughed or reduced employee who refuses recall or restoration to a position, at least as high in grade as that from which reduced and in the same major department, metropolitan area and status (i. e., regular part-time or full-time), forfeits all seniority and recall rights. He will not forfeit seniority and recall rights, however, if he refuses a position not meeting all of the above criteria.

3. A furloughed or reduced employee who accepts a position at least as high in grade as that held at the time of reduction, and of the same status (full-time or regular part-time) will be regarded as fully restored, regardless of the major department or metropolitan area in which the job falls.

4. Employees physically incapacitated at time of recall offer, but desiring to return to work, shall remain on furlough status (not exceeding two and one half years from date of furlough) until able to return to duty and a suitable vacancy exists. (Recall rights will no longer apply.)

5. In the event vacancies occur in a major department in which all restorations have been made in a given job classification, new hires will not be permitted until full consideration has been given to recalling qualified employees remaining on furlough from other departments in the metropolitan area.

6. Employees recalled from furlough shall be required to meet all employment and appearance requirements at time of reinstatement. Employee must be available to return to work no later than two weeks after recall notice unless a later date is agreed to by the supervisor.

.        .        .        .        .

(PX 1, at 7)

█ Pointing to subdivision 5 above, plaintiffs claim that Mr. Kaps failed to inform them of their right to "full consideration" in accordance with that subdivision-a claim which, if we understand the import of plaintiffs' questions of Mr. Kaps, translates into a right of "automatic recall" to any open vacancy following completion of all restorations in a given job classification. If this is plaintiffs' contention, we reject it as patently absurd (see PX 1, at 7, item G3). As Mr. Kaps testified, "qualified," former employees were entitled to "full" consideration—not automatic recall. The primary concern for TWA in such a recall was whether the person was qualified. And if plaintiffs are claiming that they were not informed that they would be given "full consideration" ahead of new hires for a new position for which they were "qualified" (assuming that they could establish their

10. Under the TWA MP&P, a furloughed employee with over two years' service can receive one week's pay for every year of service up to a maximum of eight weeks. Also, a furloughed employee is entitled to certain recall rights to his former location and classification for a two and one-half year period (DX 7, at 1).

qualifications for that new position, *see* MP&P § 10.49.02(C)(3)(d) (first sentence), we think, even if that was the case, that it fails to establish the kind of misrepresentation that plaintiffs must establish for their claim of relief.[11] And, we think that Mr. Kaps' discussion of plaintiffs' furlough rights outlined above and contained in Defendant Ex. 7 (or synopsis of benefits handed out at the March meeting) was sufficient, in any case.

■ Finally, plaintiffs contend that Mr. Kaps did not explain or even consider explaining to plaintiffs the possibility of transferring or displacing within TWA ranks (specifically within the Cincinnati ATO). Since several of the plaintiffs (including plaintiff Furr) had already attempted such a transfer/promotion under the TWA Form 288/295 procedures prior to the date of the March meeting (*see* note 1, *supra* ), and plaintiffs inquired at the meeting about other jobs at the TWA Cincinnati station (doc. 24, ¶ 13), we find this claim of a "misrepresentation" to be without merit. In connection with this argument, plaintiffs point to the second sentence of MP&P § 10.49.02(C)(3)(d) as supportive of their claim [12] (July 18 cross-examination of Mr. Kaps). We find that sentence of § 10.49.-02(C)(3)(d) inapplicable to plaintiffs (July 18 redirect examination of Mr. Kaps)—as plaintiffs evidently admit (doc. 24, ¶ 11). As far as plaintiffs' arguments concerning

the denial of Charles Spriggs' application for a job as a ticket agent in December, 1974, we think plaintiffs have fundamentally lost touch with the basis for their claim of relief. Plaintiffs argue that Mr. Spriggs was discriminated against because the individual who was awarded the position had six and one-half years less seniority, "less education" and "had never been employed within the ATO division as Mr. Spriggs had" (doc. 24, ¶ 12). Yet the undisputed facts established that the "other individual" (Mr. Gary King) was also black. We fail to see how these facts can establish the violation of Title VII on which plaintiffs base their claim.

■ Finally, the evidence at trial established that TWA's system displacement policy operated in a non-discriminatory fashion. Mr. Kaps testified that approximately one year prior to his March meeting with the plaintiffs, he explained the same rights and options to a group of white employees in Nashville, Tennessee, who were scheduled to be furloughed due to the termination of the entire TWA Nashville station.[13] This testimony, along with our evidence, demonstrated that white TWA personnel were governed by the MP&P in exactly the same manner as were the plaintiffs.

## II. THE RAMP SERVICE OPENINGS

The testimony at trial demonstrated that plaintiffs inquired, either at the meeting or

---

11. *See* p. 69 *infra.*

12. That section reads as follows:
   3. Displacements

   . . . . .

   d. In all cases an employee must have the ability to do the work of a job class in order to displace into it. *In the case of job classes having functional areas ( *Customer Service Agents and Accountants—Corporate Accounting), job or Company seniority (as the case may be pursuant to Paragraph "C.1." above) within the function shall prevail.* An employee reduced from a function shall be permitted to exercise seniority to displace to other functions provided he has the qualifications required in the particular job assigned and is able either to perform the new tasks based on past experience or else to demonstrate that he is capable of satisfactorily performing such tasks within a reasona-

ble period. The final determination of competency rests with management.

* Functional Areas

| Customer Service Agents | Accountants |
| --- | --- |
| ATO | Passenger Revenue |
| Cargo Oper & Svcs | Cargo Revenue |
| Ramp Svcs & Dining & Commissary Svcs | Cost, Payroll & Disbursements |
| | General Accounting |

(PX 1, at 3)   (Emphasis added.)

13. In fact, Mr. Kaps testified that he put together DX 7, the "Synopsis of Benefits" plaintiffs received at the March meeting, primarily as a result of questions raised at the Nashville meeting.

shortly thereafter, whether other jobs might be available in the TWA Cincinnati operation and that they were told that there might be two openings with the Ramp Service, but this was not definite. In an effort to assist the skycaps, Mr. Robert Walton, their supervisor, testified that he contacted TWA officials in Dayton, Columbus, Los Angeles and other cities to determine if those stations anticipated any openings and that he advised all of the skycaps to submit a 295 transfer request form as soon as possible. This testimony appears to us to be credible as this procedure was successfully used by one of the former Cincinnati skycaps, Mr. Ron Cottie, a black man (and not one of the plaintiffs herein) to transfer to Los Angeles.

The uncontested testimony is that plaintiffs did not avail themselves of either the 288 or 295 TWA transfer procedure but instead contacted a Reverend Moss, the director of a group entitled People United to Save Humanity (PUSH) here in Cincinnati, to intercede in their behalf with TWA. Subsequently, all of the six plaintiffs were offered jobs as ramp servicemen with TWA and the evidence shows that they accepted these positions and began working as ramp servicemen on the Monday following their Saturday termination date (May 20, 1974). In short, none of the plaintiffs lost a day of work as a result of being terminated as a skycap. Plaintiffs are all presently working as TWA ramp servicemen.

Plaintiffs, of course, claim that they received these positions as ramp servicemen as a result of Reverend Moss' intercession. Defendant, however, presented evidence through the testimony of Mr. Maegly, a former shift supervisor in TWA's ramp cargo services, and Mr. Gex, the former manager of TWA's ramp cargo services, to the effect that TWA was concerned for the welfare of the skycaps and that the ramp service vacancies, for which preference was given to the skycaps, opened up due to other transfers and the increased demands of the expanded TWA operations at the new airport facility. In addition, Mr. Gex

testified that he solicited at least one of the plaintiffs (John Hunter) for a job as a ramp serviceman. We find it unnecessary to resolve this dispute because the uncontested testimony demonstrated that plaintiffs all secured positions as ramp servicemen starting on May 20, 1974 and there is no evidence that any other vacancies existed in the TWA Cincinnati operation during April or May of 1974. And since it was this transfer from the skycap position to ramp service which forms the other basic cause of plaintiffs' complaint, we now turn to examine the import of that transfer.

■ As skycaps (i. e., non-contract employees), all of the plaintiffs' seniority rights, sick leave benefits, etc., were governed by the TWA's Management Policy and Procedure Manual (MP&P), which covers all non-contract, non-management domestic personnel including customer service agents (or ticket agents). However, as ramp servicemen, plaintiffs became contract (i. e., union) employees and came under the coverage of a collective bargaining agreement negotiated between TWA and the International Association of Machinists and Aerospace Workers (IAM). See JX 1 (effective January 28, 1970 through March 14, 1975) and DX 6 (effective March 14, 1975 through October 21, 1975). The seniority system under this agreement is contained in Article Six, which states in pertinent part:

(1) Seniority shall be defined as the *length of service* for which an employee receives credit, regardless of location, *in any of the classifications* covered by this Agreement with this Company or any of its predecessors.

(2) . . . seniority . . . shall accrue from the date of entering a classification for a regular assignment. . . .

.        .        .        .        .

(5) The principle of seniority shall apply in the application of the Agreement

in all reductions or increases of force, preference of shift, days off, vacation period selection, in bidding for vacancies or new jobs, and in all promotions, demotions or transfers involving classifications covered by this Agreement.

(JX 1, at 33–34; DX 6, at 31–32) (Emphasis added.)

The TWA–IAM seniority system, therefore, operates on the basis of job seniority rather than company seniority and there are over twenty job classifications covered by the agreement (including that of ramp servicemen) (JX 1, at 37, Article 6(c)(4)). This job classification seniority system has been in continuous operation between TWA and IAM since 1946 (DX 5, Article VI (a), (b), at 11; July 18 testimony of Robert Kaps). Thus, when the plaintiffs transferred from being skycaps to ramp service, the TWA–IAM job seniority provisions came into effect rendering plaintiffs' prior accrued company seniority and sick leave as skycaps a nullity.[14]

■ Plaintiffs contend (as part of their claim of misrepresentation) that they were not informed at the time of their transfer of the impact of the TWA–IAM seniority system on their accumulated benefits and that they did not learn of its effect until February, 1975, when Ronald Furr applied for sick leave in order to enter the hospital for an operation. At that time, Furr testified, he discovered that he only had three to four sick days accumulated and he then discussed this matter with his union shop steward. Defendant, however, presented evidence that plaintiff knew or should have known of the effect of the TWA–IAM seniority system at the time of their transfer. Mr. Gex testified that it was the routine practice of TWA to conduct an orientation session with new ramp servicemen, that he conducted such an orientation session with plaintiffs Furr, Oliver and Hunter and that he informed them of the job seniority system and gave each a copy of the TWA–IAM collective bargaining agreement at the time or shortly thereafter (DX 2, 2, 4; Testimony of Mr. Gex). Mr. Maegly testified that he informed plaintiffs that they would be at the bottom of the seniority list when they started in ramp services and plaintiff Scott admitted that Mr. Maegly informed him of this fact. In addition, plaintiff Furr admitted that he received a copy of the applicable collective bargaining agreement within about a week of his May 20, 1974 orientation session. In light of the above, we find that there was no misrepresentation regarding the impact of the TWA–IAM agreement on plaintiffs' seniority at the time of their transfer.

## III. OTHER EVIDENCE

There was also evidence presented at trial concerning various transfer applications. Plaintiff Furr testified that he applied for a job as a Quality Control Agent in 1970 but he did not receive it because he did not have enough experience. Mr. Furr also testified that he applied for a job as a ticket agent but he did not receive it. Plaintiff Charles Spriggs also applied for a job as a ticket agent in December, 1974. As we noted above, this latter job was filled by another black man, Mr. Gary King. There was also testimony presented to the effect that this vacancy filled by Mr. King was the only opening for a full-time customer service agent in TWA's Cincinnati operation in 1974, that there were no such openings in 1975 or 1976 and that the next vacancies occurred in June, 1977 (July 18 testimony of Robert Walton). Mr. Walton testified that the two vacancies which opened up in June, 1977 were filled by Mr. King (who had in the interim been furloughed) and Ms. Sandra Havens, a black woman. Mr. Walton also testified that an additional opening oc-

---

14. There was testimony at trial, however, to the effect that if plaintiffs ever transferred back to a noncontract position, they would regain their "lost" seniority.

curred in July, 1978, and was filled by a Mr. Beckmiller, a white male who had a form 295 transfer request on file. Thus, in four and one-half years, only four vacancies as full-time customer service agents occurred and three were filled by black employees.[15]

Defendant also presented evidence concerning the employment record of another former skycap, Mr. Ronald Lewis and his experience with the TWA transfer policy (DX 9). Mr. Lewis began his employment with TWA in 1964 as a skycap in Cincinnati. In 1968, Mr. Lewis transferred to a job as a customer service agent in Cincinnati by exercising his options under the TWA MP&P transfer policy (July 18 testimony of Robert Kaps). Since that time, Mr. Lewis has held a number of positions and he is now presently employed as Manager of the TWA Commissary (a management position) in Kansas City, Missouri (DX 9; Testimony of Robert Kaps).

Finally, there was testimony concerning an offer of a skycap position made in December of 1975 by Philip Shafer, manager of the Dayton ATO, to plaintiff Furr. Mr. Furr testified that the job offer was conditioned on his dropping the present lawsuit. Mr. Shafer denied this and testified that Mr. Furr was simply offered the job and refused. There was also evidence presented that neither the instant lawsuit, nor its companion state case, were filed at that time.[16]

It is stipulated between the parties that each plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on May 9, 1975 (DX 13(a) to 13(f)).

Based on the facts as we have found them above we reach the following conclusions of law.

■ First, § 706(e) of Title VII, 42 U.S.C. § 2000e–5(e) requires that a charge of discrimination be filed within 180 days after the alleged unlawful employment practice occurred. The 180-day period in this case began running on November 9, 1974. Timely filing is prerequisite to the maintenance of a Title VII suit and, in that sense, this time limitation is jurisdictional. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 555 n. 4, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Guy v. Robbins & Myers, Inc.*, 525 F.2d 124, 127–29 (6th Cir. 1975) *rev'd on other grounds*, 429 U.S. 229, 241–44, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976). In recent years, however, courts have used two devices to extend this time limitation for equitable reasons. These devices were the concepts of "continuing violations" and the concept of tolling. B. Schlei & P. Grossman, Employment Discrimination Law 861–71, 884–913 (1976).

■ The concept of a continuing violation was recently discussed by the Supreme Court in *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In *Evans*, plaintiff, a female flight attendant, was discharged in 1968 under a "no-marriage" policy later held to violate Title VII. Plaintiff, however, did not file a charge within the applicable time period under § 706(d). After her rehire in 1972, plaintiff attempted to have her pre-1972 seniority credited to her and, when this failed, she sued. In the Supreme Court, plaintiff argued that, although her claim based on the 1968 discharge was time barred, that United was guilty of a "present continuing violation" because the seniority system gave "present effect to the past illegal act and therefore perpetuates

---

**15.** Mr. Walton also testified on cross-examination that he thought there were some part-time customer service agent vacancies in 1975 or 1976, but that he didn't know how many there were.

**16.** The state court case was filed on February 26, 1976 and the federal court case was filed on December 29, 1976.

the consequences of forbidden discrimination." 431 U.S. at 557, 97 S.Ct. at 1888. The Supreme Court rejected the argument in the following language:

> Respondent is correct in pointing out that the seniority system gives present effect to a past act of discrimination. But United was entitled to treat that past act as lawful after respondent failed to file a charge of discrimination within the 90 days then allowed by § 706(d). *A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.*

> Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. *But the emphasis should not be placed on mere continuity; the critical question is whether any present violation exists.* She has not alleged that the system discriminates against former female employees or that it treats former employees who were discharged for a discriminatory reason any differently from former employees who resigned or were discharged for a non-discriminatory reason. In short, the system is neutral in its operation. (431 U.S. at 558, 97 S.Ct. at 1889) (Emphasis added.)

We understand *Evans* to mean that: 1) a denial of seniority credit under a *bona fide* seniority system based upon a past act of discrimination which is now barred is not a "present violation" for the purpose of the

time limitation of section 706(e), 42 U.S.C. § 2000e–5(e); [17] and 2) the focus of our inquiry is whether a "present violation" (occurring within 180 days of the charge) exists. In short, the mere fact that a *bona fide* seniority system perpetuates the effects of a past discriminatory act does not establish a "present violation" of Title VII. To that extent, the "continuing violation" theory is dead and a Title VII plaintiff with no other act of discrimination to complain of must attack the *"bona fides"* of the seniority system itself under section 703(h). Applied to the present case, *Evans* means that plaintiffs may not merely rely on the impact of their May, 1974 transfer on their seniority rights to support their claim of a "present violation." Since that act was outside the 180-day period, "it is merely an unfortunate event . . . which has no present legal consequences."

■ The other equitable device used by the Courts to extend the time period under section 706(e) was the concept of tolling. *See* B. Schlei & P. Grossman, Employment Discrimination Law 909–13 (1976). In light of recent Supreme Court cases, we are uncertain whether this concept is still alive. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81–83, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *United Air Lines, Inc. v. Evans*, 431 U.S. at 558, 97 S.Ct. 1885; *International Brotherhood of Teamsters v. U. S.*, 431 U.S. at 347–56, 97 S.Ct. 1843; *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). *But see* S. Clemens, cable from Europe to the Associated Press, *quoted in* 2 A. Paine, Mark Twain: A Biography 1039 (1912). In addition, the concept has not been favorably received in this Circuit. *See Guy v. Robbins*

---

**17.** This is assuming that the past act of discrimination was not the adoption of the seniority system with an intent to discriminate—an act which would prevent the seniority system from being considered *"bona fide"* within § 703(h) of the Act. *See United Air Lines, Inc. v. Evans*, 431 U.S. at 558 n. 10, 97 S.Ct. 1885;

*International Brotherhood of Teamsters v. U. S.*, 431 U.S. 324, 346 n. 28, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Alexander v. Aero Lodge No. 735, IAM*, 565 F.2d 1364, 1377–79 (6th Cir. 1977). *See also* 42 U.S.C. § 2000e–2(h); *Quarles v. Philip Morris, Inc.*, 279 F.Supp. 505 (E.D.Va.1968) and pp. 69–70 *infra*.

& *Myers, Inc.*, 525 F.2d at 127–28; *Ott v. Midland-Ross Corp.*, 523 F.2d 1367, 1369–70 (6th Cir. 1975) (ADEA). However, even if the concept of tolling is legally viable, we think that plaintiffs have failed to prove the necessary facts for it to apply. We don't think plaintiffs were either affirmatively misled by defendant or were reasonably unaware of the possibility of a violation with respect to either the March, 1974 meeting or the May, 1974 transfer under the facts as we have found them above. *See* B. Schlei & P. Grossman, *supra*, at 909–10.

■ Since plaintiffs may not rely on tolling or the "continuing violation" concepts to bring their claims of discrimination arising out of pre-November, 1974 acts (*i. e.*, lost seniority, etc.) before this Court, they must attack TWA's seniority system itself and prove that it is not a *"bona fide"* seniority system within the protection of section 703(h), 42 U.S.C. § 2000e–2(h). Based on the facts as found above, we think they have failed to do this. There was no showing that either the TWA–IAM seniority system or the MP&P seniority system or even the operation of the two together was negotiated, designed, or maintained with an intention to discriminate on the basis of race. From the evidence presented, the seniority systems appeared to be facially neutral. 42 U.S.C. § 2000e–2(h); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 82–83 n. 13, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 343–56, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Alexander v. Aero Lodge No. 735, IAM*, 565 F.2d 1364, 1376–79 (6th Cir. 1977). We are aware that discriminatory intent must often be inferred from discriminatory impact. *See Arlington Heights v. Metropolitan Housing Authority*, 429 U.S. 252, 264–268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1976); *Washington v. Davis*, 426 U.S. 229, 253–54, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring). In this case, however, we think plaintiffs have even failed to demonstrate discriminatory impact. As we noted above, plaintiffs presented no statistical proof to verify their claim. And we reject the notion, put forth by plaintiffs' counsel, that plaintiffs' positions as skycaps were undesirable or that they were "locked into" them. *See Quarles v. Philip Morris, Inc.*, 279 F.Supp. 505 (E.D. Va.1968). Nor, as we noted above, was any proof presented that an intent to discriminate entered into the adoption of the departmental seniority systems involved in the present case. *United Brotherhood of Teamsters v. U. S.*, 431 U.S. at 346 n. 28, 97 S.Ct. 1843.

In short, on the facts and the law, we think that defendant is entitled to judgment.

Appendix to follow.

# APPENDIX

| Employee Displacing in Seniority Order | Locations Desired in Preference Order | Locations of Most Junior Employees | Result of Displacement | Effect of Displacing on Employee | Effect of Refusal to Displace After Award |
|---|---|---|---|---|---|
| A | ABQ STL MKC | MKC | Employee A receives 3rd choice - MKC | Employee A - Job Protected | Loss of Seniority |
| B | PHL ORD STL DAY | TUS | Employee B cannot displace preference & possibilities not matched. | Employee B Furloughed with Layoff Pay | Not Applicable |
| C | ANY | OKC | Employee C exercises seniority to TUS | Employee C Job Protected | Loss of Seniority |
| D | ANY | JFK | Employee D exercises seniority to OKC | Employee D Job Protected | Loss of Seniority |
| E | BOS MKC STL PIT | MIA | Employee E cannot displace preference & possibilities not matched. | Employee E Furloughed with Layoff Pay | Not Applicable |

SENIORITY →

DEFENDANT'S EXHIBIT NO. 1