**Joan FINNEGAN, et al., Plaintiffs,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

**No. 88 C 4265.**

United States District Court, N.D. Illinois, E.D.

April 29, 1991.

Thomas R. Meites, Lynn Sara Frackman, Paul W. Mollica, Meites, Frackman & Mulder, Samuel Witwer, Gregory N. Freerksen, Witwer, Burlage, Poltrook & Giampietro, Chicago, Ill., for plaintiffs.

Thomas J. Piskorski, Richard B. Lapp, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Michael A. Katz, Trans World Airlines, Inc., Mt. Kisco, N.Y., for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Following the imposition by defendant Trans World Airlines (TWA) of a four-week cap on the amount of vacation time noncontract employees could accrue each year, a number of senior employees who had earned vacation time in excess of four weeks per year before imposition of the cap filed the instant suit, claiming that TWA had adopted the new policy in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34 (ADEA). TWA has moved for summary judgment. Plaintiffs, in turn, have filed a cross-motion for summary judgment. For the reasons stated herein, this court grants TWA's motion.

## BACKGROUND

The following facts are undisputed by the parties.[1] In 1985 TWA, a major domestic and international air carrier, was in dire financial straits.[2] That year a group of investors led by Carl Icahn began acquiring control of TWA, completing their acquisition in January 1986 (Def.Ex. 1 at 1; Def. Mulvany Dep. at 5; Def. Glass Dep. at 13–14, 24–25). As the acquisition progressed, Icahn directed TWA to reduce its employment costs for all employee groups by $300 million (Def. Pearson Dep. at 6, 15, 74–75; Def. Punwani Dep. at 11; Def. Glass Dep. at 26; Def. Mulvany Dep. at 18).

Even before Icahn's involvement, TWA had made earlier efforts to reduce its operating costs. In 1984 TWA implemented a second wage scale (the "B" scale) under which agents, clerical, and management employees hired on or after March 1, 1984,

1. Both sides to this litigation rely on many of the same depositions, albeit on different portions, and exhibits. Plaintiffs' deposition excerpts will be referred to as "Pl. [deponent] Dep.," and plaintiffs' exhibits will be referred to as "Pl.Ex." TWA's deposition excerpts will be referred to as "Def. [deponent] Dep." TWA's exhibits filed in support of its motion for summary judgment will be referred to as "Def.Ex." Exhibits contained in TWA's appendix in support of its motion and in opposition to plaintiffs' cross-motion, apparently obtained through plaintiff depositions, will be referred to as "Pl. Dep.Ex." in accordance with TWA's numbering system.

2. According to TWA's 1985 Annual Report, the airline suffered a pre-tax loss of $217.1 million and an operating loss of $62.4 million in 1985, had suffered a pre-tax loss each year since 1979 (with the exception of 1984), had suffered an operating loss each year since 1979 (with the exception of 1981 and 1984), and had seen its cash reserves decreased from $400 million in early 1985 to $50 million by year's end (Def.Ex. 1 at 261, 270–71, 287–88; Def. Glass Dep. at 92).

received less in compensation and benefits than employees hired before that date (Def.Ex. 10 at 10–11). Among the benefits reduced for B-scale employees was the amount of vacation benefits that could be earned in a year. The old policy, which had applied to all noncontract employees, was as follows:

| Number of Full Years Active Service with Company Completed On or Before Jan. 15 of Year Vacation is Due to be Taken | Domestic Employees (Work Days) | U.S. Nationals Based Overseas (Work Days) |
|---|---|---|
| 1 through 4 years | 10 | 22 |
| 5 through 9 years | 15 | 22 |
| 10 through 16 years | 20 | 22 |
| 17 through 24 years | 25 | 25 |
| 25 through 29 years | 30 | 30 |
| 30 years and over | 35 | 35 |

(Def.Ex. 28; Pl.Ex. 47).

---

The new policy, which applied to all noncontract new hires as of March 1, 1984, was as follows:

| Number of Full Years Active Service with Company Completed On or Before Jan. 15 of Year Vacation is Due to be Taken | Vacation Allowance (Work Days) |
|---|---|
| 1 through 5 years | 10 |
| 6 through 15 years | 15 |
| 16 through 25 years | 20 |
| 26 years and more | 25 |

(Def.Ex. 28; Def.Ex. 10 at 10–11; Def.Ex. 4 at 25–27; Pl.Ex. 47).[3]

---

Icahn's directive spurred TWA's senior management into action. In late August, 1985, Charles Glass, then TWA's senior vice-president and controller, outlined for Richard Pearson, then TWA's president, a "possible reassessment of benefit programs to mitigate noncontract pay cuts" that included a *"rough* set of estimates of the annual effect of certain benefit reductions related to the noncontract work force"[4] (Pl. Dep.Ex. 1). Among the benefits Glass proposed for reduction were va-

3. TWA management independently imposed additional cost reduction measures prior to the Icahn directive. On June 19, 1985, Pearson imposed an expense control plan that included 1) a hiring freeze, 2) staffing and training on the assumption that TWA would acquire no new aircraft in 1986, and 3) a 10% reduction in "discretionary" expenditures such as travel, supplies, and advertising (Def.Ex. 20). That same day, Pearson also imposed a spending freeze on all capital projects, including those on which the airline already had made commitments (Def.Ex. 20).

4. While preliminary estimates indicated that employment cost reductions for noncontract employees would account for some $83 million of the reduction, TWA eventually determined that these costs would have to be cut by $93 million (Pl. Dep.Ex. 4; Def. Mulvany Dep. at 20; Def. Punwani Dep. at 11; Def. Pearson Dep. at 7).

cation days, floating and birthday holidays, management overtime, the medical and dental plans, and the thrift plan (*Id.*). According to Glass' estimates, imposing a four-week vacation cap would save TWA some $1.2 million in replacement costs and $4 million from a one-time favorable impact on TWA's income statement.[5] Glass also estimated the savings that could be realized from a three-week cap.

TWA announced its cost reduction plan to its noncontract employees in stages, beginning in October 1985. On October 18, 1985, Pearson announced that, effective November 1, 1985, TWA would reduce the wages for all salaried employees by 14% to a minimum of $1400 per month, or $6.90 per hour; reduce the number of management employees by 15% and the number of nonmanagement, noncontract employees by two percent; and undergo a departmental reorganization in order to move toward a "more cost-effective operation" (Def. Pearson Dep. at 11–12, 16; Pl. Dep.Ex. 7). In an accompanying statement, Icahn announced that all noncontract employees whose pay was being reduced would take part in a profit-sharing plan that was being developed (Pl. Dep.Ex. 13).

On October 30, 1985, Pearson and Icahn announced that in addition to the previously announced cuts[6] cost reduction for noncontract employees would also include: 1) a 50% reduction in advertising for the remainder of 1985; 2) a hiring freeze for the remainder of 1985; 3) elimination of floating and birthday holidays; 4) revision of the medical and dental plans; and 5) the capping of vacation benefits at four weeks per year (Pl. Dep.Ex. 8). In late 1985, TWA added one more element to its cost-reduction plan by establishing a voluntary termination program (VTP) for salaried employees who had been hired on or before December 31, 1976, and were either active or on an approved medical leave as of October 1, 1985 (Def. Pearson Dep. at 31; Def.Ex. 3).[7]

Although it considered several alternative methods of reducing vacation benefits, TWA ultimately decided to adopt the four-week vacation cap as part of its cost-reduction plan. Like the old vacation plan, employees would accrue vacation time over the course of one year for use during the next. Under the new plan, however, employees could accrue no more than four weeks vacation time—twenty work days—per year. The four-week cap, which went into effect on January 1, 1986, worked in the following manner:

For employees hired before March 1, 1984:

| Number of Full Years Active Service with TWA On or Before Jan. 15 of Year Vacation is Due to be Taken | Domestic Employees and U.S. Nationals Based Overseas (Work Days) |
|---|---|
| 1 through 4 years | 10 |
| 5 through 9 years | 15 |
| 10 years and over | 20 |

---

5. Reducing vacation benefits would enable TWA to enjoy savings on two fronts. First, TWA would reduce costs associated with paying replacement employees—either new hires or current employees working overtime—to fill in for vacationing employees (Def.Ex. 2 at 8–9; Def.Ex. 3 at 14–15; Def.Ex. 4 at 64–65; Def.Ex. 6 at 41, 54–58; Def.Ex. 9 at 42). Second, because TWA carried the vacation benefits accrued by noncontract employees as a liability on its books, imposing the vacation cap would result in a one-time favorable impact on its profit and loss statement (Def.Ex. 3 at 17–19; Def.Ex. 6 at 41, 60–62).

6. At this time, Pearson and Icahn announced that the previously announced 14% pay cut would be postponed to January 1, 1986.

7. TWA had offered voluntary termination programs in the past as well (Pearson Dep. at 37).

For employees hired after March 1, 1984:

| Number of Full Years Active Service with TWA On or Before Jan. 15 of Year Vacation is Due to be Taken | Vacation Allowance (Work Days) |
|---|---|
| 1 through 5 years | 10 |
| 6 through 15 years | 15 |
| 16 years and over | 20 |

---

(Pl.Ex. 47).[8] Because they already had been accrued, the number of vacation days actually taken in 1986 was based on the former policy. Under the new policy, beginning January 1, 1986, noncontract employees began accruing the vacation days that would be taken in 1987.

Finally, TWA implemented a profit-sharing plan in which noncontract employees participated, under which TWA would return up to 20% of any annual "adjusted income" for 1986, 1987 and 1988 (Pl. Dep. Exs. 33, 34; Def. Pearson Dep. at 42–43, 45). Under the plan each employee would receive a profit share based upon the sum of his individual contribution, as a percentage of the total savings contributed by all noncontract and passenger service employees. The contribution for each employee was based upon the dollar value of their pay reduction, a $1260 credit for tax and benefit savings, and the dollar value of the amount of annual vacation time they had lost as a result of the four-week vacation cap (Id.; Pl.Exs. 50, 51). Because TWA suffered a $75.2 million operating loss in 1986, there was no profit-sharing distribution for that year. In 1987, however, TWA operated at a profit and $2,488,000 was distributed to eligible employees (Pl. Dep.Ex. 33 at 17; Pl. Dep.Ex. 32).[9]

Plaintiffs, all current TWA employees, had been sufficiently senior under TWA's prior vacation plan to have been earning in excess of four weeks annual vacation at the time the four-week cap was imposed and lost as much as three weeks vacation time under the new policy. Claiming that the four-week cap violates the ADEA, they filed their complaint with this court on May 16, 1988, after first having filed administrative charges with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. Plaintiffs later filed a second amended complaint as well. Subsequently, TWA filed its motion for summary judgment, to which plaintiffs filed their cross-motion for summary judgment. It is to those motions that we now turn.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Schroeder v. Copley Newspaper*, 879 F.2d 266, 268 (7th Cir.1989). The movant bears the burden of specifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R. Civ.P. 56(c)). In response, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio*

---

8. TWA reduced vacation benefits for its part-time employees as well.

9. Neither side indicates whether TWA made a profit sharing distribution for 1988.

*Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment motions must be considered in light of both the applicable substantive law and the question of whether a reasonable jury could render a verdict in the nonmovant's favor on that basis. *Checkers, Simon & Rosner v. Lurie Corp.,* 864 F.2d 1338, 1344 (7th Cir.1988).

## II. Statute of Limitations Issues

As a threshold issue, TWA contends that plaintiffs' claims are time-barred unless they can prove that TWA willfully violated the ADEA. The ADEA adopts the statute of limitations of the Portal-to-Portal Act, which requires that claims must be brought within two years after a cause of action accrues unless the violation was willful, in which case a three-year statute of limitations applies. 29 U.S.C. § 255(a). In order to determine whether plaintiffs' May 16, 1988 complaint was timely filed, this court first must determine the date on which their cause of action accrued.

The parties sharply contest the accrual date. TWA contends that two possible accrual dates exist. The first, October 30, 1985, is the date on which TWA announced the four-week vacation cap; the second, January 1, 1986, is the date on which that cap went into effect—when noncontract employees began accruing vacation time under the new policy. Under either of these dates plaintiffs' claims are time-barred unless they can prove that TWA's vacation cap plan was a willful violation. Plaintiffs, however, contend that the correct accrual date was January 1, 1987, the beginning of the first year in which non-contract employees actually taking (rather than accruing) vacation time could take off no more than four weeks in a year. If January 1, 1987 was the correct accrual

date, then all aspects of plaintiffs' claims are timely filed.

The Seventh Circuit's recent decision in *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446 (7th Cir.1990), issued after the parties had fully briefed their motions, settles the dispute. In *Cada,* the court explained that

> *Ricks* [10] establishes that it is the date of ... adverse personnel action, not the date on which the action takes effect ... that—provided it is communicated to the employee, and it was here—is the date of accrual [for an employment discrimination claim].

920 F.2d at 453.[11]

Under *Cada,* therefore, the date on which plaintiffs' cause of action accrued would seem to be October 30, 1985—the date on which the new vacation policy, *i.e.,* the "adverse action," having been adopted, was communicated to TWA's noncontract employees. The latest possible date of accrual, had there been no advance communication by TWA, would be January 1, 1986—the date on which affected employees began to accrue vacation time under the new plan.[12] With regard to either of these two dates, however, plaintiffs failed to file suit within the two-year statute of limitations for nonwillful ADEA violations, but did file suit within the three-year statute of limitations for willful violations.

■ Plaintiffs claim that, despite failing to file their complaint with this court within the two-year statute of limitations, their disparate impact claim, whether or not a willful violation, is saved by the Age Discrimination Claims Assistance Acts of 1988 and 1990, Pub.L. 100–283, 102 Stat. 78, 29 U.S.C. § 626 note, and Pub.L. 101–504

10. *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).

11. This does not mean that all ADEA actions must be filed within the statute of limitations of the date of accrual or be forever barred. The equitable tolling doctrine is available in those cases (such as those involving a facially neutral policy) in which the plaintiff cannot gather the necessary evidence within the limitations peri-

od. *See Davidson v. Board of Governors of State Colleges & Universities, etc.,* 920 F.2d 441, 444–45 (7th Cir.1990).

12. Plaintiffs' suggested date on which their cause of action accrued would be erroneous even in the absence of *Cada.* The accrual (i.e., earning) of vacation time, not just its use, was subject to the four-week vacation cap.

(1990).[13]  This court need not address plaintiffs' contention, however, for, as discussed in the next section, their disparate impact claim against TWA is not cognizable under the ADEA.

## III.  *Applicability of ADEA § 4(f)(2) to TWA's Vacation Plan*

■  Despite the ADEA's prohibition against arbitrary age discrimination in employment decisions, as written at the time TWA adopted the four-week vacation cap,[14] § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2), provided in relevant part:

It shall not be unlawful for an employer ...—

\*    \*    \*    \*    \*    \*

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter....

TWA's vacation policy bases each employee's entitlement to vacation time on the number of years of continuous service with the airline;  the amount of vacation time each employee may accrue per year is based on that employee's seniority within the vacation system.  TWA's vacation policy is a seniority system within the meaning of ADEA § 4(f)(2).[15]

■  As plaintiffs concede, a seniority system need not have been the result of collective bargaining to fall within the scope of § 4(f)(2).  *See EEOC v. Fox Point–Bayside School Dist.,* 772 F.2d 1294, 1301–02 (7th Cir.1985).  Plaintiffs do contend, however, that for a seniority system to fall within § 4(f)(2), it must provide an enforceable right that an employer cannot alter unilaterally.  Contrary to plaintiffs' assertion, nothing in the ADEA prohibits employers from altering the terms of a benefit seniority system as long as the new system is not a subterfuge for engaging in arbitrary age discrimination.[16]  *Cf. Furr v. Trans World Airlines, Inc.,* 461 F.Supp. 58 (S.D.Ohio 1978) (TWA's Management Policy and Procedure Manual, which contains its vacation policy, recognized as a bona fide seniority system under § 703(h) of Title VII, 42 U.S.C. § 2000e–2(h)).[17]

**13.**  The Claims Assistance Acts revive lapsed ADEA claims under certain circumstances in which a charging party has filed a timely claim and the EEOC has failed to either eliminate the alleged unlawful practice or notify the charging party of the disposition of the charge and of the right to sue within the applicable statute of limitations.  *See Zabielski v. Montgomery Ward & Co.,* 919 F.2d 1276 (7th Cir.1990).

**14.**  *See infra* note 18.

**15.**  As the Supreme Court noted in *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), two varieties of seniority systems exist.  "Competitive seniority" systems allocate the entitlement to scarce resources, such as promotion or protection from demotion, among employees.  "Benefit seniority" systems, in contrast, are used to " 'compute *noncompetitive* benefits earned under the contract of employment.' "  *Lorance,* 490 U.S. at 902 n. 1, 109 S.Ct. at 2263 n. 1 (quoting *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 766, 96 S.Ct. 1251, 1265, 47 L.Ed.2d 444 (1976).  TWA's vacation policy falls within the latter category.

**16.**  Contrary to plaintiffs' assertion, *Pitre v. Western Electric Co.,* 843 F.2d 1262, 1271 (10th Cir. 1988) does not stand for the proposition that an employer never may alter unilaterally a bona fide seniority system.  *Pitre* merely indicates that an employer's informal and erratic application of a seniority system in order to lay off otherwise protected workers may indicate that the system is a subterfuge for discrimination and thus is not bona fide.

**17.**  TWA contends that its vacation policy could be considered an employee benefit plan as well as a seniority system, thus falling within the scope of § 4(f)(2) under either prong.  The Supreme Court has yet to decide the precise scope of the phrase "any bona fide employee benefit plan such as a retirement, pension, or insurance plan" in ADEA § 4(f)(2).  *See Public Employees Retirement System v. Betts,* 492 U.S. 158, 109 S.Ct. 2854, 2865 n. 6, 106 L.Ed.2d 134 (1989).  In *Massachusetts v. Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), decided the same term, however, the Court held that where vacation benefits are paid out of an employer's general assets rather than from a trust fund, those benefits constitute a "payroll practice," rather than an "employee benefit plan" as that term is used in ERISA.  *Morash,* 490 U.S. at 112–119.  This court sees no reason for the term "employee benefit plan" to be construed differently in both ERISA and the ADEA as it then was drafted.  In the absence of any evidence indicating whether TWA's vacation plan is an "employee benefit plan" or merely a "payroll practice," however, this court cannot regard it as falling within that prong of § 4(f)(2).

Under the Supreme Court's recent decision in *Public Employees Retirement System v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), a plaintiff seeking to challenge a plan falling within the scope of § 4(f)(2) "bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some nonfringe-benefit aspect of the employment relation." 109 S.Ct. at 2868.[18] At least with regard to employment actions falling within the scope of § 4(f)(2), therefore, plaintiffs may not bring their disparate impact claim under the ADEA. This result merely reflects common sense. A claim that TWA's alteration of its seniority-based vacation plan had a disparate impact upon the more senior employees in that system would amount to a mere tautology: vacation length is calculated on the basis of seniority which, as a general rule, correlates with age; *any* alteration of such a plan inevitably would have a disparate impact on the most senior and therefore, although not necessarily, the oldest employees.[19] Plaintiffs' disparate impact claim must be dismissed.

## IV. *Plaintiffs' Intentional Discrimination Claim*

■ In their initial administrative charges and, indeed, in their original and amended complaints, plaintiffs emphasized a disparate impact theory which, as we have held, cannot stand under *Betts*. In what may best be termed a remarkable display of prescience, plaintiffs' response to TWA's motion for summary judgment departs from their original allegations to present a theory of intentional age discrimination on the part of TWA management. Specifically, plaintiffs now claim that TWA expected that by reducing the maximum amount of vacation that could be taken to 20 workdays, it would so offend employees over 40 that they would feel constrained to resign under the VTP and relinquish any profit-sharing possibilities. The plan therefore, they contend, actually was intended to serve the purpose of discriminating in nonfringe-benefit aspects of the employment relation, namely continued employment. TWA has moved for summary judgment on this claim on the ground that plaintiffs can advance no evidence to support their allegations.[20] Plaintiffs' cross-motion for summary judgment does not encompass this claim; rather, they have elected only to oppose TWA's motion.

18. Congress recently enacted the Older Workers Benefit Protection Act, Pub.L. 101–433, 104 Stat. 978 (October 16, 1990) (as amended by Pub.L. 101–521, 104 Stat. 2287 (Nov. 5, 1990)), which counteracts the *Betts* holding by 1) permitting age-based reductions in employee benefit plans only where justified by significant cost considerations; and 2) placing the burden of proof on the employer to demonstrate that its actions are lawful, rather than on the employee to demonstrate that they are not.

Congress gave the Act only prospective effect. Accordingly, our analysis remains controlled by *Betts'* definition of the subterfuge requirement and its placement of the burden of proof on the plaintiffs. *See EEOC v. Westinghouse Elec. Corp.,* 925 F.2d 619, 622 n. 2 (3d Cir.1991).

19. Even an across-the board percentage reduction in vacation time advocated by the plaintiffs as a far more equitable cost reduction mechanism would reduce the absolute vacation time that could be accrued by those most senior in the system to a greater extent than those who are most junior.

TWA's list of employees who elected to retire early under the VTP, the number of years they

spent with the airline, and their age at retirement, reveals two important facts that must be kept in mind: that a TWA employee was senior enough to have lost vacation time under the four week cap or was senior enough to elect the VTP did not necessarily mean that that employee was old enough to fall within the age group protected by the ADEA. To the extent seniority could be used as a proxy for age, however, a definite correlation did exist (Pl. Dep.Ex. 61).

20. TWA first became aware of this additional theory of liability when it received plaintiffs' brief in response to TWA's motion and in support of their own cross-motion for summary judgment. As a result of plaintiffs' delay in raising this theory, TWA did not argue for summary judgment on that claim in its opening brief. Plaintiffs' delay should not stand as a bar to TWA's entitlement to summary judgment on that issue; accordingly, this court will consider TWA's reply/response arguments to be part and parcel of its motion for summary judgment. As is explained below, TWA has responded adequately in its reply/response brief and accompanying evidentiary appendix to enable this court to rule in its favor.

In arguing that TWA used the four-week cap as the stick to force senior employees to accept the VTP "carrot," this court assumes, plaintiffs are not attempting to raise a constructive discharge claim. In the first place, none of the plaintiffs left TWA following imposition of the cap; the three former employees who aver that they felt compelled to elect the VTP as a result of the imposition of the four-week cap (Pl. Exs. 38–40) are not parties to this case. Moreover, while it is mere common sense to assert that employees immediately affected by the four-week cap were upset by the loss, to claim that their jobs were made intolerable as a result does not even begin to approach the objective standard necessary to constitute an act of constructive discharge. This, however, is what plaintiffs claim motivated TWA; at its heart is the allegation that TWA adopted the cap, at least in part, because of the age of the employees who likely would be most affected. Accordingly, this court will consider plaintiffs' summary judgment evidence to this effect as probative of TWA's intent.

The Supreme Court has set forth two "evidentiary paths" by which plaintiffs claiming to have been victims of intentional employment discrimination may prove their case.[21] The path followed is determined in large part by the nature of the case the plaintiff attempts to prove. *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989). Where a plaintiff is able to prove affirmatively that an illegitimate consideration such as age was a substantial factor in an employment decision, the burden of proof then shifts to the defendant to prove by a preponderance of the evidence that it would have made the same decision in the absence of the illegitimate motive. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). If the plaintiff cannot demonstrate affirmatively that age was a substantial factor, the appropriate analytical framework becomes that established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and reaffirmed in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), under which the plaintiff may, by proving the employer's proffered legitimate reason to be a pretext, support the negative inference that the "true" reason for the employer's decision was illegitimate. *Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1789 (Brennan, J., plurality), 490 U.S. at 260, 109 S.Ct. at 1796 (White, J., concurring), 490 U.S. at 278–79, 109 S.Ct. at 1805–06 (O'Connor, J., concurring). *See Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir.1989) (applying the *Burdine* framework after plaintiff failed to meet the *Price Waterhouse* requirement of proving race was a substantial factor underlying his demotion).

## A. Mixed–Motive Analysis Under Price Waterhouse[22]

Plaintiffs first attempt to make out a *prima facie* case under *Price Waterhouse*. In order to do so, they must at a minimum present some direct evidence demonstrating that age was a substantial factor in TWA's decision to adopt the four-week vacation cap. Plaintiffs' sole direct evidence

---

**21.** Although these methods of proof were conceived in the context of Title VII, their reasoning is equally applicable, and has been extended to, cases arising under the ADEA. *Visser v. Packer Engineering Assoc., Inc.*, 924 F.2d 655 (7th Cir.1991) (en banc); *Ayala v. Mayfair Molded Products Corp.*, 831 F.2d 1314, 1318 (7th Cir.1987).

**22.** The Seventh Circuit has held that a plaintiff must present direct evidence of discrimination in order to invoke the *Price Waterhouse* analysis. *Randle*, 876 F.2d at 569. It appears, however, that a plaintiff who presents direct evidence of discrimination, thus falling within *Price Waterhouse*, may present circumstantial evidence as well. In *Visser*, the court, in considering the plaintiffs' evidence under *Price Waterhouse*, looked not only for "[t]he proverbial 'smoking gun,'" but for circumstantial evidence of an illegitimate motive as well. *Visser*, 924 F.2d at 658–59. Rejecting the direct evidence on the grounds that affidavits based solely on speculation would not have been admissible at trial, the *Visser* court held that circumstantial evidence, standing alone, was insufficient to shift the burden of proof to the employer. *Id.* at 659–60. *But see Id.* at 664 (Cudahy, J., dissenting) ("[O]ne may get into mixed motive analysis by presenting either direct *or* circumstantial evidence.").

comes from the deposition of Charles Glass:

> I don't remember a lot of discussion on the subject [of whether a vacation cap would impact older workers more than younger workers]. I may have been my own comment in a meeting, but I did remember someone saying if it really is offensive to them, they do have early retirement options.

(Pl.Ex. 2 at 51–52). To say that this remark constitutes direct evidence of discriminatory intent would be attenuated; to the extent that it does, however, plaintiffs must do more than state that the remark was made in order to support their claim. They must prove that it was made by a decisionmaker in connection with the decision to adopt the challenged employment practice. Plaintiffs, however, present no evidence that Richard Pearson, who as TWA's president was the final decisionmaker with regard to the vacation cap, made the statement, heard it, or in any way agreed with it.[23] Glass himself cannot identify who made the statement or, for that matter, when it was made (it could have been made after the decision to adopt the four-week cap). At best, the statement on which plaintiffs rely so heavily is nothing more than a stray remark. "Such remarks ... when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria...." *Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989). *See Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring) ("statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden in this regard.").

Plaintiffs also contend that TWA's discriminatory intent may be inferred circumstantially from evidence 1) that TWA knew that the most senior employees would be hit the hardest by the vacation cap and would be upset by the reduction; 2) that TWA considered the impact its cost-reduction plan would have on employee morale in estimating the number of employees who would elect the VTP; and 3) that TWA sought through the VTP to reduce the ranks of its senior management, a feat it could not accomplish by way of a furlough.

Plaintiffs first contend that TWA knew that the vacation cap would impact most heavily upon the more senior employees, who would be upset at the loss of vacation time. Specifically, they point to a transcript of a meeting between TWA president Richard Pearson and unidentified employee representatives who protested the vacation cap approximately three weeks after it was imposed (Pl.Ex. 12 at 54–55, 105). Plaintiffs assert that this transcript indicates that TWA's decisionmakers had been aware that the four-week cap would impact most heavily upon those senior in the vacation system who had been enjoying vacations of greater length, and that those whose vacations were cut likely would be unsatisfied.[24]

Assuming for purposes of summary judgment that Pearson and other members of TWA's senior management were aware of the impact and the dissatisfaction that could be expected to result, such knowledge is not sufficient to create a genuine issue of fact with regard to the issue at hand: whether TWA adopted the cap for legitimate reasons, albeit with an awareness of this possible side effect, or whether TWA adopted the cap in substantial part because it would have this result. Contrary to plaintiffs' assertions, TWA's knowledge is not dispositive of its intent. *See Visser*, 924 F.2d at 660 (awareness that discharging employee would lead to denial of pension benefits does not mean that this necessarily motivated employee's discharge and is insufficient to establish a *prima*

---

**23.** Pearson himself testified that he was unaware of any statement by Glass or someone else to the effect that employees unhappy with the vacation cap could take early retirement (Def.Ex. 4 at 49).

**24.** According to a transcript of this meeting, Pearson acknowledged that the four-week cap hit senior employees the hardest and that a debate as to the fairness of this impact had been continuing for some time among senior management. (Pl.Ex. 12 at 54–55, 105).

*facie* case of age discrimination under *Price Waterhouse* ); *Weihaupt v. American Medical Association,* 874 F.2d 419, 426 (7th Cir.1989) (while employer was aware demotion might embarrass employee, there was no evidence that employer demoted employee with intent to force his resignation).

Plaintiffs next argue that TWA's discriminatory intent may be inferred from the fact that, in attempting to estimate the number of employees who would elect the VTP, Glass considered the impact the cost reduction measures would have on employee morale. Plaintiffs emphasize Glass' testimony that he and the personnel department considered the impact of the "many onerous things happening in the October time frame" (Pl.Ex. 64 at 45), and expected slightly higher numbers of employees to opt for the VTP than would have "in a less adverse environment" (Pl.Ex. 14 at 55–56). Plaintiffs apparently would have this court infer from this evidence that the environment for workers in the protected group was intentionally made "adverse" and "onerous" by way of the vacation cap. Such an inference, however, would not be reasonable. It is undisputed that the "environment" into which TWA introduced the VTP in October 1985 did not consist of the vacation cap alone. Among the cutbacks in the compensation packages of the noncontract employees announced simultaneously in addition to the vacation cap and VTP, were a 14% wage reduction, elimination of floating and birthday holidays (totalling some eleven days per year) and revision of the medical and dental plans (Def. Fact 22). To infer from Glass' statements that TWA expected its employees to decide whether to elect the VTP solely on the basis of the four-week cap would be unreasonable.

■ Finally, plaintiffs offer summary judgment evidence concerning TWA's plans to reduce its noncontract management by 15%, and its noncontract nonmanagement employees by 2%. According to plaintiffs, documentary evidence demonstrates that TWA hoped that these reductions would come from senior management, who would take advantage of the incentives offered by the VTP and who, upon leaving, would be replaced by promoting more junior employees who remained (Pl.Ex. 33 at 2; Pl.Ex. 18). As further support, plaintiffs point to an October 18, 1985 analysis conducted by John Gaiser, TWA's director of compensation and benefits, to determine the number of employees eligible for the VTP (Pl.Ex. 42). Noting Gaiser's subsequent deposition testimony that an age analysis would have been "totally irrelevant" to the VTP— which was based solely on years with the company rather than age—plaintiffs contend that they at least have raised a genuine issue as to why the analysis was conducted (Pl.Ex. 14 at 60–61). Even accepting the inferences drawn by plaintiffs as true for purposes of summary judgment, however, their evidence in this regard is probative only of TWA's motivation in adopting the VTP, which is not at issue in this litigation.[25]

Plaintiffs have presented no direct or circumstantial evidence to demonstrate the existence of a genuine issue of material fact as to whether a substantial factor underlying TWA's decision to adopt the four-week vacation cap was to induce the retirement of older employees. Accordingly, the burden-shifting framework of *Price Waterhouse* is inapplicable and this court must consider whether the legitimate reasons proffered by TWA for imposition of the vacation cap were its "true" reasons under the framework of *McDonnell Douglas* and *Burdine. Smith v. Firestone Tire and Rubber Co.,* 875 F.2d 1325, 1330 (7th Cir. 1989).

### B. Pretext Analysis Under McDonnell Douglas

Neither side disputes whether plaintiffs have satisfied their *prima facie* case under

---

**25.** Early retirement plans by definition are adopted with the expectation that more senior members of an employer's workforce will voluntarily leave when eligible to do so. They do not violate the ADEA unless it can be demonstrated that the employer made working conditions so intolerable that the employee was effectively forced into accepting early retirement. *Henn v. National Geographic Soc.,* 819 F.2d 824 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987).

*McDonnell Douglas.* Accordingly, the primary issue before this court is whether plaintiffs can demonstrate a genuine issue of material fact as to whether TWA's proffered legitimate reasons for its decision to adopt the four-week vacation cap were in fact a pretext for age discrimination. Plaintiffs may demonstrate pretext either by direct evidence that TWA was more than likely motivated by a discriminatory reason, or by indirectly showing that TWA's proffered explanations are not entitled to credence. *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1364 (7th Cir. 1988). Having previously failed to present any probative direct evidence, plaintiffs' sole recourse is to demonstrate that TWA's reasons were not worthy of credence. This they may do by demonstrating 1) that TWA's reasons had no basis in fact; 2) that TWA's reasons did not actually motivate their decision; or 3) that TWA's reasons were insufficient to motivate their decision. *Mechnig,* 864 F.2d at 1365 (quoting *Kier v. Commercial Union Insurance Companies,* 808 F.2d 1254, 1259 (7th Cir.), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987)).

TWA advances several legitimate reasons for its decision to adopt the four-week vacation cap: 1) that its management considered the existing vacation benefits to be "excessively generous;" 2) that an across-the-board cut would drop its minimum vacation benefit below two weeks—which TWA considered to be the accepted minimum in American industry; and 3) that an across-the-board cut would fall more harshly on employees entitled to less vacation— which TWA considered an unfair result. To these plaintiffs add a fourth reason—on which TWA no longer relies but on which plaintiffs base their primary pretext argument—that TWA adopted the cap to bring its vacation benefits in line with those of other airlines. It is to plaintiffs' attack on this last reason that this court first turns.

In answering plaintiffs' first set of interrogatories, TWA stated that "[t]he change in vacation policy was part of a comprehensive program to reduce [TWA's] operating expenses, to maintain [TWA] as an economically viable carrier, and to bring TWA vacation benefits more in line with vacation benefits provided by other airlines." (Pl.Ex. 59). Plaintiffs contend that their evidence clearly demonstrates that this explanation was pretextual. In support of this contention plaintiffs offer evidence that TWA made no investigation of the vacation benefits offered by other airlines before it adopted the four-week vacation cap (Pl.Ex. 3 at 28; Pl.Ex. 13 at 20–21; Pl.Ex. 27 at 118–19). Accepting plaintiffs' evidence as undisputed, it nonetheless fails to demonstrate a genuine issue as to pretext when placed in context by TWA. Ranesh Punwani, TWA's vice-president of financial controls at the time, has testified that his department conducted an annual industrywide comparison of salaries and benefits. According to Punwani, this annual report had revealed that before the $300 million cost-reduction plan TWA was offering higher salaries and benefits than other airlines (Def. Punwani Dep. at 104–05). In light of this preexisting knowledge, that TWA did not conduct a narrow survey limited to vacation benefits in assembling its comprehensive cost-reduction package is not surprising.

As further support, plaintiffs present a May 1987 Air Conference Negotiator's Summary of the vacation benefits offered by other major airlines that, they claim, indicates that rather than bringing TWA in line with other carriers, the vacation cap actually placed TWA below its competition in terms of vacation benefits (Pl.Ex. 26). In their insistence on assessing the validity of the four-week vacation cap in a vacuum, plaintiffs fail to account for Punwani's further statement that, while TWA sought to remain competitive in pay and benefits with the rest of the industry, its primary goal was "[t]o be competitive *while ensuring that the bottom line was acceptable.* That's a very strong qualification" (Def. Punwani Dep. at 49–50) (emphasis added). From this perspective, a comparison of vacation benefits alone becomes relatively meaningless.[26] This court will not infer an unlawful motive on so slim a premise.

---

26. Just what plaintiffs' Exhibit 36 proves is itself questionable. First, while TWA's vacation cap

■ Plaintiffs contend that TWA's explanation that it believed vacation benefits in excess of four weeks were excessively generous is insufficient as a matter of law. Plaintiffs are wrong. A subjective basis does not convert an otherwise legitimate reason for an employment decision into an illegitimate reason. *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1427 (7th Cir.1986). In the absence of any evidence of bad faith, this court will not question TWA's business judgment of how much vacation time was reasonable in light of the airline's overall economic health. *Dorsch*, 782 F.2d at 1426. The ADEA was not intended as a vehicle for judicial review of business decisions. *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981).

Finally, TWA also claims to have been motivated by a desire to keep its minimum vacation benefit at two weeks, and to avoid an across-the-board plan that would fall more harshly on the most junior employees. From TWA's perspective, decreasing the vacation time of those who had little to begin with would have had a far greater real impact than decreasing the vacation time of those who, under the old policy, had much more. Plaintiffs, however, contend that TWA's concern for its junior employees was a discriminatory, rather than non-discriminatory, reason for adopting the four-week vacation cap.

■ Plaintiffs essentially contend that because TWA at one time provided its most senior noncontract employees with more vacation days than its most junior employees, the ADEA obligated TWA to perpetuate that quantum of preferential treatment. The ADEA mandates equal—not preferential—treatment for those in its protected age group. *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1217 (7th Cir.1985). As the Seventh Circuit has recognized:

> [E]conomic imperatives must be continually balanced against the requirements of the age discrimination law.... For this reason, we think general pay reductions are less a threat to senior employees than terminations would be (in part because employers are less likely to cut pay unless economic circumstances absolutely require it). Certainly, however, in the case before us, we lay down no general rules about what circumstances might justify pay cuts for older employees. We only suggest that the language of the statute does not require that in this case we regard discharge or reduction in pay as the same thing (although they may have economic similarities and, under proper circumstances, they can both result in a successful ADEA claim).

*Metz v. Transit Mix, Inc.*, 828 F.2d 1202, 1210 (7th Cir.1987). Reducing the amount of plaintiffs' annual vacation benefits, while continuing to provide them with vacations of equal or greater length than those with less seniority in the system, was not age discrimination in violation of the ADEA.[27]

Courts must take caution in granting summary judgment, particularly under a statute such as the ADEA, which allows for trial by jury. In the instant case, however, no rational jury could bring in a verdict for plaintiffs on the evidence presented. TWA is entitled to summary judgment under the circumstances. *Visser*, 924 F.2d at 660 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1570 (7th Cir.1989)).

---

placed it below most others in terms of vacation benefits, prior to the imposition of the cap most of the other airlines had lower maximum vacation benefits than TWA. Second, the summary provides no indication of the extent to which the airlines listed were unionized; thus the extent to which other airlines were comparable to TWA's noncontract workforce is unclear. Third, although the summary was dated May 1987—over a year after TWA's vacation cap went into effect—it lists TWA's maximum vacation benefit as 30 days, thus calling into question the accuracy of the information presented.

**27.** Moreover, those whose vacation benefits were in fact reduced by imposition of the vacation cap received profit sharing distributions in excess of those whose vacations were not immediately affected by the cap (Pl.Exs. 50, 51).

## CONCLUSION

TWA's motion for summary judgment is granted. Plaintiffs' cross-motion for summary judgment is denied. Plaintiffs' motion for a preliminary injunction is dismissed as moot.