USCA1 Opinion

 

 United States Court of Appeals For the First Circuit
No. 98-1656 WILLIAM MULLIN, Plaintiff, Appellant, v. RAYTHEON COMPANY, Defendant, Appellee. APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] Before Selya, Circuit Judge, Coffin and Campbell, Senior Circuit Judges. J. Allen Holland, with whom John R. Cavanaugh and Lynch,
Brewer, Hoffman & Sands, LLP were on brief, for appellant. James F. Kavanaugh, Jr., with whom Deborah W. Kirchwey and
Conn, Kavanaugh, Rosenthal, Peisch & Ford, L.L.P. were on brief,
for appellee.
January 13, 1999 SELYA, Circuit Judge. Plaintiff-appellant William Mullin
sued his employer, defendant-appellee Raytheon Company, contending
that his demotion (and a concomitant reduction in remuneration)
constituted age discrimination in contravention of both the federal
Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621-634,
and the Massachusetts Anti-Discrimination Act, Mass. Gen. Laws ch.
151B, 4(1B), (Chapter 151B). The district court granted
Raytheon's motion for summary judgment on all counts. See Mullinv. Raytheon Co., 2 F. Supp.2d 165 (D. Mass. 1998). Mullin's appeal
raises, inter alia, a question of first impression in this circuit
as to the viability of "disparate impact" claims in age
discrimination cases. We conclude that such claims are not
cognizable under either federal or state law.
I. BACKGROUND Consistent with the summary judgment standard, we recount
the material facts in the manner most congenial to the appellant's
theory of the case, accepting his (properly documented) version of
genuinely disputed facts and drawing all reasonable inferences in
his favor. See Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st
Cir. 1995); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.
1990). Raytheon assigns salaried employees a labor grade on a
numeric scale that ranges from 4 to 18. Each grade corresponds to
a different (successively higher) earnings bracket. Prior to
filing this action, the appellant worked for Raytheon for some
twenty-nine years. He steadily climbed the corporate lattice. In
1979, he achieved a grade of 15 and became manager of manufacturing
operations for Raytheon's Andover (Massachusetts) plant a
position in which he supervised more than 2,000 employees. At that
point, his upward progression ceased. Although he retained a grade
15 classification until 1995, his duties changed and his authority
gradually contracted. In 1984, Raytheon transferred Mullin to its
Lowell (Massachusetts) plant, where he became a second-shift
manager, supervising some 400 employees. Beginning in 1989, the
company informally assigned him to the role of trouble-shooter and
transferred him from area to area, according to need. In 1994,
Raytheon designated him as the manager of the Gyro and Motorwind
Work Centers at the Lowell plant a position in which he oversaw
fewer than 100 subordinates. Over the years, Raytheon's principal business has been
the manufacture of military ordnance. When the Cold War ended and
Congress slashed the Defense Department's procurement budget, the
volume of work potentially available to Raytheon decreased
proportionately. In an effort to adjust to these economic
realities, Raytheon inaugurated major structural changes. Among
other steps, it closed the Lowell plant and one in Manchester, New
Hampshire, and folded the operations previously performed at those
locations into its Andover plant. In the process, Raytheon
relocated the appellant and his department to Andover. In addition to plant closings and consolidations, the
retrenchment produced a significant number of layoffs and
reassignments. It also included a wage freeze, during which
Raytheon assayed the commensurability of upper-level salaried
employees' assigned labor grades and actual responsibilities. The
company evaluated each position in light of criteria such as the
complexity of the work undertaken, the number of employees
supervised, and the financial responsibility inherent in the job. In the appellant's case, it deemed his grade (15) inconsistent with
his duties and downgraded him to level 12 an action that, under
established corporate policy, required a downward compensation
adjustment to bring him within the salary range that corresponded
to his new classification. Claiming that age discrimination prompted this demotion,
the appellant sued. His complaint, grounded in both federal
question jurisdiction, 28 U.S.C. 1331, and diversity
jurisdiction, 28 U.S.C. 1332 Mullin is a citizen of New
Hampshire and Raytheon is a Delaware corporation with its principal
place of business in Massachusetts set out four statements of
claim: two for disparate treatment (one under the ADEA and one
under Chapter 151B) and two for disparate impact (one under the
ADEA and one under Chapter 151B). After a period of discovery,
Raytheon moved for brevis disposition and the district court
obliged. See Mullin, 2 F. Supp.2d at 175. This appeal ensued.
II. ANALYSIS Summary judgment is a device that "has proven its
usefulness as a means of avoiding full-dress trials in unwinnable
cases, thereby freeing courts to utilize scarce judicial resources
in more beneficial ways." Mesnick v. General Elec. Co., 950 F.2d
816, 822 (1st Cir. 1991). Its essential role is "to pierce the
boilerplate of the pleadings and assay the parties' proof in order
to determine whether trial is actually required." Wynne v. Tufts
Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992). The
mechanics of the device are familiar, see, e.g., Garside, 895 F.2d
at 48, and do not warrant exegetic description here. For present
purposes, it suffices to note that summary judgment should be
granted when "there is no genuine issue as to any material fact and
. . . the moving party is entitled to a judgment as a matter of
law." Fed. R. Civ. P. 56(c). In determining whether these
criteria have been satisfied, we, like the trial court, "must view
the entire record in the light most hospitable to the party
opposing summary judgment, indulging all reasonable inferences in
that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st
Cir. 1990). With this brief preface, we turn to the appellant's
asseverational array. In the process, we review the lower court's
decision de novo. See Garside, 895 F.2d at 48. A. Disparate Treatment ADEA and Chapter 151B Claims. The tripartite burden-shifting regime conceived by the
Supreme Court for use in Title VII cases, see St. Mary's Honor Ctr.v. Hicks, 509 U.S. 502, 506-11 (1993); Texas Dep't of Community
Affairs v. Burdine, 450 U.S. 248, 252-56 (1981); McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 802-05 (1973), applies to disparate
treatment claims under the ADEA and Chapter 151B. See, e.g.,
Mesnick, 950 F.2d at 823 (ADEA); Whalen v. NYNEX Info. Resources
Co., 419 Mass. 792, 795, 647 N.E.2d 716, 718 (1995) (Chapter 151B). The parties concede that the appellant proffered a prima facie case
and that Raytheon, by citing the cuts in defense spending, the
attendant need to downsize, and the outcome of the personnel
reevaluation, articulated a legitimate, non-discriminatory
explanation both for restructuring and for demoting the appellant. Thus, the contest here revolves around the third step of the
McDonnell Douglas pavane. For purposes of Mullin's ADEA-based disparate treatment
claim, we must therefore concentrate on whether he adduced enough
evidence to create a trialworthy question both as to the employer's
alleged motivation (animus based on age) and as to the
pretextuality of its explanation for the adverse employment action. See Mesnick, 950 F.2d at 823; Medina-Munoz v. R.J. Reynolds Tobacco
Co., 896 F.2d 5, 8-9 (1st Cir. 1990). The appellant's burden under Chapter 151B is somewhat
less onerous. While federal law requires a showing of pretext plus
age animus, the Massachusetts courts appear, at the third step of
the pavane, to require a claimant to show only pretext. See Blarev. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 444-
46, 646 N.E.2d 111, 116-17 (1995). The difference between the
federal "pretext-plus" standard and the Massachusetts "pretext-
only" standard, though sometimes significant, is irrelevant in this
case. The district court determined that the appellant failed to
raise a genuine issue as to either pretext or age animus, seeMullin, 2 F. Supp.2d at 172, and, since we agree with the former
determination, the appellant's disparate treatment claims fail
under either standard. We need not tarry. Raytheon advanced a strong,
objectively verifiable set of reasons for consolidating operations,
restructuring its work force, and downgrading Mullin: significant
revenue loss stemming from massive Defense Department cutbacks,
culminating in a reevaluation of all upper-echelon salaried
employees. The appellant points to nothing that casts doubt upon
the legitimacy of this reason, nor does he proffer any substantial
evidence that would permit a rational jury to find that Raytheon
rigged the restructuring in a fashion designed to ensure that the
appellant's labor grade and/or compensation level would be reduced
unfairly. The district court painstakingly analyzed all the
appellant's submissions in this regard, see id. at 169-71, and it
would be pleonastic to rehearse that discussion here. We content
ourselves with saying that, after having carefully sifted the
record, we uphold the lower court's disposition of the disparate
treatment claims for essentially the reasons elucidated in its
rescript. See Lawton v. State Mut. Life Assur. Co. of Am., 101
F.3d 218, 220 (1st Cir. 1996) (counseling appellate courts not to
wax longiloquent when a trial court has resolved a claim correctly
and explained its rationale in a well-reasoned rescript); In re San
Juan Dupont Plaza Hotel Fire Litig., 989 F.2d 36, 38 (1st Cir.
1993) (similar). B. Disparate Impact ADEA. The linchpin of a disparate treatment claim is proof of
the employer's discriminatory motive. See International Bhd. of
Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). Not so
a claim of disparate impact: that type of claim is predicated not
on proof of intentional discrimination, but, rather, on proof that
the employer utilizes "employment practices that are facially
neutral in their treatment of different groups but . . . in fact
fall more harshly on one group than another and cannot be justified
by business necessity." Id. Although the district court skirted
the question whether a disparate impact cause of action lies under
the ADEA, see Mullin, 2 F. Supp.2d at 174-75, we take a more direct
route. See Mesnick, 950 F.2d at 822 ("An appellate panel is not
restricted to the district court's reasoning but can affirm a
summary judgment on any independently sufficient ground."). We begin by focusing on the statutory language. SeeLandreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985). In
pertinent part, the ADEA makes it unlawful for an employer "to fail
or refuse to hire or to discharge any individual or otherwise
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's age." 29 U.S.C. 623(a)(1). A
commonsense reading of this statement strongly suggests that the
statute includes a requirement of intentional discrimination. SeeEllis v. United Airlines, Inc., 73 F.3d 999, 1007 (10th Cir. 1996)
("It would be a stretch to read the phrase 'because of such
individual's age' to prohibit incidental and unintentional
discrimination that resulted because of employment decisions which
were made for reasons other than age.") (emphasis in original). However, Title VII contains parallel language, and the Supreme
Court concluded almost three decades ago that such language
encompassed a theory of liability based on disparate impact. SeeGriggs v. Duke Power Co., 401 U.S. 424, 431 (1971) (holding that
Title VII "proscribes not only overt discrimination but also
practices that are fair in form, but discriminatory in operation"). The question, then, is whether the ADEA, despite the apparent
linguistic inhospitability, also should be read to encompass
disparate impact claims. Congress enacted the ADEA in 1967. Prior to 1993,
several courts ruled that the ADEA permitted the maintenance of
disparate impact claims. See, e.g., Finnegan v. Trans World
Airlines, Inc., 967 F.2d 1161, 1163 (7th Cir. 1992); Maresco v.
Evans Chemetics, 964 F.2d 106, 115 (2d Cir. 1992); EEOC v.
Borden's, Inc., 724 F.2d 1390, 1394-95 (9th Cir. 1984); Leftwich v.
Harris-Stowe State Coll., 702 F.2d 686, 690 (8th Cir. 1983). All
of these courts simply assumed that Griggs had settled the issue. The tectonic plates shifted when the Court decided an ADEA case,
Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). Although Hazen
Paper involved disparate treatment rather than disparate impact,
see id. at 610, language in the majority and concurring opinions
caused lower courts to rethink the viability of disparate impact
doctrine in the ADEA context. Writing for a unanimous Court in Hazen Paper, Justice
O'Connor declared that "[d]isparate treatment . . . captures the
essence of what Congress sought to prohibit in the ADEA." Id. at
610. Congress passed the ADEA due to "its concern that older
workers were being deprived of employment on the basis of
inaccurate and stigmatizing stereotypes." Id. Consequently, the
rationale that undergirds the statute is inapposite in instances
where the employment decision is "wholly motivated by factors other
than age, . . . even if the motivating factor is correlated with
age." Id. at 611. This analysis is telling. Since disparate impact claims
encompass the precise scenario that Justice O'Connor describes disparate impact assigns liability when employment practices are
grounded in factors other than the statutorily protected
characteristic (say, age), yet fall more harshly on individuals
within the protected group (say, older persons) the inescapable
implication of her statements is that the imposition of disparate
impact liability would not address the evils that Congress was
attempting to purge when it enacted the ADEA. Equally as
important, Justice O'Connor's exposition of the purposes
underpinning the ADEA sets that statute apart from Title VII (and,
thus, effectively distinguishes Griggs). Congress enacted Title
VII in an effort to equalize employment opportunities for
individuals whose employment prospects had been dimmed by past
discriminatory practices. See Griggs, 401 U.S. at 429-30. Neutral, non-essential employment policies that discriminatorily
impact protected groups would, if transposed onto such an uneven
baseline, exacerbate the preexisting imbalance and countervail the
core purpose of Title VII. Hence, the Court had ample reason to
construe the language of Title VII to bar such practices, when not
justified by an actual business necessity. See id. at 431. By contrast, age-based discrimination correlates with
contemporaneous employment-related conditions, not past
discriminatory practices. See Hazen Paper, 507 U.S. at 610-12;
Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313
(1976). The aging process is inevitable, and Congress was not
trying to dissolve those naturally occurring relationships through
the medium of the ADEA, but, rather, aimed to protect older workers
against the disparate treatment that resulted from stereotyping
them as less productive and therefore less valuable members of the
work force because of their advancing years. This divergence in
purpose between Title VII and the ADEA counsels convincingly
against mechanistic adherence to Griggs in the ADEA milieu. The concurring opinion in Hazen Paper lends further
support to this conclusion. In it, Justice Kennedy wrote for
himself and two other Justices to underscore that "nothing in the
Court's opinion should be read as incorporating in the ADEA context
the so-called 'disparate impact' theory of Title VII." Hazen
Paper, 507 U.S. at 618 (Kennedy, J. concurring). "[T]here are," he
wrote, "substantial arguments that it is improper to carry over
disparate impact analysis from Title VII to the ADEA." Id. Other courts also find the arguments to which Justice
Kennedy referred compelling. Since 1993, a majority of the courts
of appeals that have addressed the question have held that the ADEA
does not recognize causes of action premised on disparate impact. See Ellis, 73 F.3d at 1007; Lyon v. Ohio Educ. Ass'n & Prof'l Staff
Union, 53 F.3d 135, 138-39 (6th Cir. 1995); EEOC v. Francis W.
Parker Sch., 41 F.3d 1073, 1077 (7th Cir. 1994). The two courts of
appeals that have held to the contrary have done so in reliance on
pre-Hazen Paper precedents and the law of the circuit doctrine. See District Council 37 v. New York City Dep't of Parks &
Recreation, 113 F.3d 347, 351 (2d Cir. 1997) (relying on Maresco,
964 F.2d 106); Houghton v. SIPCO, Inc., 38 F.3d 953, 958-59 (8th
Cir. 1994) (assuming, without any discernible analysis or citation,
the availability of disparate impact theory, presumably in light of
Leftwich, 702 F.2d 686). Three additional considerations persuade us that the
majority view is correct, that Hazen Paper foretells the future,
that Griggs is inapposite in the ADEA context, and that proof of
intentional discrimination is a prerequisite to liability under the
ADEA. We touch briefly on each consideration. 1. Text and Structure. A critical asymmetry in the
texts of the ADEA and Title VII counsels convincingly against
recognizing a disparate impact cause of action under the former
statute. The ADEA stipulates that "[i]t shall not be unlawful for
an employer . . . to take any action otherwise prohibited . . .
where the differentiation is based on reasonable factors other than
age." 29 U.S.C. 623(f)(1). This proviso permits employers to
utilize factors other than age as grounds for employment-related
decisions that differentially impact members of the protected class
(individuals between the ages of 40 and 69). When this exception
is read with the ADEA's general prohibition against age-based
discrimination, the resulting construction follows: it shall be
unlawful to "discriminate against any individual . . . because of
such individual's age," except when "based on . . . factors other
than age." Thus, if the exception contained in section 623(f)(1)
is not understood to preclude disparate impact liability, it
becomes nothing more than a bromide to the effect that "only age
discrimination is age discrimination." Such a circular
construction would fly in the teeth of the well-settled canon that
"[a]ll words and provisions of statutes are intended to have
meaning and are to be given effect, and no construction should be
adopted which would render statutory words or phrases meaningless,
redundant or superfluous." United States v. Ven-Fuel, Inc., 758
F.2d 741, 751-52 (1st Cir. 1985). The Supreme Court's treatment of similar language in the
Equal Pay Act is instructive on this front. In County of
Washington v. Gunther, 452 U.S. 161 (1981), the Court addressed 42
U.S.C. 2000e-2(h), a statute that exempts wage differentials
between men and women "authorized by the provisions of section
206(d) of Title 29" from Title VII's general prohibition against
gender-based discrimination. Section 206(d), in turn, covers four
types of situations, one of which parallels the exemption found in
ADEA 623(f)(1). Distilled, this provision allows payment of
differential wages to men and women "based on any other factor
other than sex." 29 U.S.C. 206(d)(1)(iv). For analytic purposes, the Court juxtaposed this
limitation on Equal Pay Act liability with Title VII's broadly
inclusive prohibition against gender-based discrimination and
commented that the limiting language worked to "confine the
application of the Act to wage differentials attributable to sex
discrimination." Gunther, 452 U.S. at 170. For that reason, the
Justices concluded that the Equal Pay Act "has been structured to
permit employers to defend against charges of discrimination where
their pay differentials are based on a bona fide use of 'other
factors other than sex'." Id.; see also City of Los Angeles v.
Manhart, 435 U.S. 702, 710 n.20, 713 n.24 (1978) (reasoning that
the Equal Pay Act's "other factors other than sex" exception
precludes liability based on disparities caused by independent
factors). This statement suggests quite forcefully that the
exception eliminates disparate impact from the armamentarium of
weapons available to plaintiffs under the Equal Pay Act and,
correspondingly, confines the scope of liability to instances of
intentional discrimination, that is, to instances of disparate
treatment. We believe that the exception found in ADEA 623(f)(1)
effects a similar limitation on the type of claims that are
permitted under the ADEA, and that any alternative conclusion would
be untenable. When the ADEA's general prohibition and the
statutory exception are read in pari materia, as a unified whole,
the prohibition forbids disparate treatment based on age and the
exception authorizes disparate impact. Thus, Professor Laycock's
commentary, made in the Equal Pay Act context, applies equally to
the ADEA: "The prohibition and the exception appear identical. The sentence is incomprehensible unless the prohibition forbids
disparate treatment and the exception authorizes disparate impact." Douglas Laycock, Continuing Violations, Disparate Impact in
Compensation, and Other Title VII Issues, 49 L. & Contemp. Prob.
53, 55 (1986). 2. Legislative History. The legislative history of the
ADEA provides added support for interpreting it independent of
Title VII in regard to disparate impact claims. When enacted,
Title VII included a provision requiring the Secretary of Labor to
conduct a detailed study on the causes and effects of age
discrimination. See Pub. L. No. 88-352, 715, 78 Stat. 265
(1964). The resulting report, entitled The Older American Worker: Age Discrimination in Employment (1965) ( the Report), served as a
principal impetus for the ADEA. See Ellis, 73 F.3d at 1008. The
Report remarked the need for legislation to combat stereotyping and
to rectify the perception that older persons cannot do particular
jobs. See Report at 6-11, 21-22. Conversely, it found "no
evidence of prejudice based on dislike or intolerance of the older
worker." Id. at 6. Inasmuch as disparate impact theory is
designed to combat invidious prejudice that is entirely unrelated
to an ability to perform the job, see Griggs, 401 U.S. at 429-32,
the Report's findings suggest that the theory has no utility in age
discrimination cases. The Report also distinguished between "arbitrary
discrimination" based on age (disparate treatment) and other
institutional arrangements that have a disproportionate effect on
older workers (disparate impact). Report at 21-25. It recommended
that arbitrary discrimination be statutorily prohibited, but that
systemic disadvantages incidentally afflicting older workers be
addressed through educational programs and institutional
restructuring. See id.; see also Ellis, 73 F.3d at 1008. The
Report thus segregated the appropriate remedies for disparate
treatment from those for disparate impact. A fair reading of the
ADEA the statute that followed hard on the heels of the Report indicates that Congress gave effect to this dichotomy by
proscribing only intentional discrimination in age cases (while
requiring the Secretary to study and develop education and research
programs to lessen the negative employment effects that attend the
aging process). See 29 U.S.C. 622-623; see also Ellis, 73 F.3d
at 1008. 3. The 1991 Amendments. The third factor that persuades
us not to emulate the Griggs approach to Title VII in the ADEA
context concerns more recent legislative developments. In 1991,
Congress amended Title VII to provide explicitly for causes of
action based upon disparate impact. See Pub. L. No. 102-166, 105, 105 Stat. 1071, 1074-75 (1991). It simultaneously amended the
ADEA in myriad respects, see, e.g., id. at 115, 105 Stat. at
1079, but it did not create a corresponding disparate impact cause
of action. We are mindful that courts ordinarily should tread slowly
in premising statutory construction on the action (or inaction) of
subsequent Congresses. See Schneidewind v. ANR Pipeline Co., 485
U.S. 293, 306 (1988). Still, what transpires in a later
legislative session sometimes constitutes a useful source of
guidance in statutory interpretation cases, see, e.g., Andrus v.
Shell Oil Co., 446 U.S. 657, 666 n.8 (1980); Seatrain Shipbuilding
Corp. v. Shell Oil Co., 444 U.S. 572, 596 (1980); United States v.
O'Neil, 11 F.3d 292, 300 (1st Cir. 1993); Liberty Mut. Ins. Co. v.
Commercial Union Ins. Co., 978 F.2d 750, 755 n.7 (1st Cir. 1992),
and we think that the circumstances at hand invite the application
of that doctrine. Congress' insertion of an express provision for
a disparate impact cause of action in Title VII renders the absence
of such a provision in the ADEA which was undergoing revision at
the same time by the same committees and in the same bill highly
significant. See Richerson v. Jones, 551 F.2d 918, 927-28 (3d Cir.
1977); cf. General Elec. Co. v. Southern Constr. Co., 383 F.2d 135,
138 n.4 (5th Cir. 1967). In sum, we have largely analogous statutes that diverge
structurally on a discrete but important point. Coupled with the
other factors we have discussed, this divergence helps to persuade
us that Congress never intended to make a disparate impact cause of
action available under the ADEA. We fully agree with the Sixth
Circuit's assessment: "The ADEA was not intended to protect older
workers from the often harsh economic realities of common business
decisions and the hardships associated with corporate
reorganizations, downsizing, plant closings and relocations." Allen v. Diebold, Inc., 33 F.3d 674, 677 (6th Cir. 1994). To say more on this point would be supererogatory. For
the foregoing reasons, we join those courts of appeals which have
held that the ADEA does not impose liability under a theory of
disparate impact. We therefore affirm the district court's entry
of summary judgment for Raytheon on the appellant's federal
disparate impact claim. C. Disparate Impact Chapter 151B. We are left with the appellant's state-law disparate
impact claim. The able district judge noted that Massachusetts has
yet to determine whether disparate impact is actionable in age
discrimination cases, but disposed of the claim on another ground. See Mullin, 2 F. Supp. 2d at 175. Consistent with our earlier
approach, we address the threshold question. The appellant disagrees that the viability of disparate
impact theory in age discrimination cases remains unsettled under
state law. He notes that Massachusetts outlaws many types of
discrimination by means of a single, comprehensive statute (Chapter
151B) and that the Massachusetts Supreme Judicial Court (SJC) has
recognized a disparate impact cause of action with respect to one
group protected by that statute. See Cox v. New Engl. Tel. & Tel.
Co., 414 Mass. 375, 385, 607 N.E.2d 1035, 1041 (1993) (discussing
handicap discrimination). Building on this foundation, the
appellant reasons that Chapter 151B makes a disparate impact theory
available to all groups who fall within its protective carapace. Although this construct possesses a certain superficial
appeal, it cannot withstand scrutiny. Chapter 151B is divided into
several sections and subsections, and the structure of the
statutory scheme itself suggests that separate provisions within
Chapter 151B are to be interpreted independently. Age, for
example, is treated separately within the Chapter 151B taxonomy. See Mass. Gen. Laws ch. 151B, 4(1B). This is especially
significant because, when the legislature amended Chapter 151B in
1984, it moved age (which previously had been grouped alongside
race, color, religion, national origin, sex and ancestry) from
within the compass of section 4(1) and placed it in a separate,
newly crafted statutory niche, section 4(1B). See An Act Relative
to the Dismissal of Certain Persons from Employment or the Refusal
to Employ Such Persons Due to Age, 1984 Mass. Acts 631, 632-33. This structural redesign constitutes potent evidence that the
legislature meant the two provisions to be distinct and interpreted
independently of one another. Were this not so, there would have
been no need to split section 4(1) in two. The appellant's hypothesis that the Massachusetts courts
have cleared disparate impact for use in all instances arising
under Chapter 151B (including age discrimination) is flawed in
another respect as well; it not only overlooks the structure of the
statutory scheme, but also misreads the case law. As stated, the
hypothesis rests upon three SJC decisions. One is Cox, to which we
soon shall return. Neither of the other two is persuasive
authority on the point. School Comm. of Braintree v. MCAD, 377 Mass. 424, 386
N.E.2d 1251 (1979), was a disparate treatment case that involved
gender discrimination. The SJC mentioned disparate treatment and
disparate impact as available theories of liability. See id. at
429, 386 N.E.2d at 1254. There is no indication that the court
intended this passing mention to encompass age discrimination. In
point of fact, the court referred specifically to race, color,
religion, sex, and national origin (all protected groups under
section 4(1)), but never mentioned age. See id. at 428, 386 N.E.2d
at 1254. The appellant's next case, Lynn Teachers Union v. MCAD,
406 Mass. 515, 549 N.E.2d 97 (1990), also concerned a disparate
treatment sex discrimination claim. The SJC stated in dictum that
"[a] prima facie case of employment discrimination can be based on
a theory of disparate impact or disparate treatment." Id. at 526,
549 N.E.2d at 103. This dictum is unhelpful for present purposes. The court's focus was on the proper scope of section 4(17)(a), a
provision of Chapter 151B that exempts "bona fide seniority
systems" from the general proscription of Chapter 151B. Relying in
part on the fact that section 4(17)(a) had been introduced into
Chapter 151B by way of the 1984 amendments, see 1984 Mass. Acts
631-33, the court held that the legislature had not intended "to
screen bona fide seniority systems from the scrutiny of all of the
Commonwealth's antidiscrimination laws." Lynn Teachers, 406 Mass.
at 525, 549 N.E.2d at 103. Rather, section 4(17)(a) was directed
only to age discrimination claims. See id. Thus, Lynn Teacherscontradicts Mullin's hypothesis in two critical aspects: it
exemplifies that all forms of discrimination proscribed by Chapter
151B ought not to be lumped together for interpretive purposes; and
it illustrates the special way in which the SJC approaches age
discrimination. Against this backdrop, we find the approach taken by the
SJC in Cox to be instructive. Cox dealt with Chapter 151B in the
context of a handicap discrimination claim. Like age
discrimination, handicap discrimination is governed by a separate
provision within Chapter 151B. See supra note 6. Recognizing that
Cox presented a question of first impression, the SJC stated that
it would look for guidance to the federal courts' treatment of
handicap discrimination under section 504 of the Rehabilitation Act
of 1973, 29 U.S.C. 794. See Cox, 414 Mass. at 382, 607 N.E.2d at
1039. Declaring that there was "no reason to construe the
Commonwealth's law differently" than its federal counterpart, the
SJC then followed federal precedents holding disparate impact
actionable under section 504. See id. at 390, 607 N.E.2d at 1043-
44; see also Alexander v. Choate, 469 U.S. 287, 297 n.17 (1985)
(collecting federal cases). Cox epitomizes the SJC's general approach in such
matters, see, e.g., White v. University of Mass. at Boston, 410
Mass. 553, 557, 574 N.E.2d 356, 358 (1991) ("The analysis of a
discrimination claim is essentially the same under the State and
Federal statutes."), and thus offers a window on the SJC's handling
of Chapter 151B. It confirms our intuition that the SJC will
interpret separate provisions of the statute independently. Moreover, Cox also shows that, when confronted with employment
discrimination claims of novel impression, the SJC tends to rely on
federal court interpretations of analogous federal statutes. Accord Vasys v. Metropolitan Dist. Comm'n, 387 Mass. 51, 54, 438
N.E.2d 836, 839 (1982) ("When the Legislature, in enacting a
statute, adopts the language of a Federal statute, we will
ordinarily construe the Massachusetts statute in accordance with
the construction given the cognate Federal statute by the Federal
courts."); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609,
611, 405 N.E.2d 106, 108 (1980) (similar). We rule, therefore, that Cox, fairly read, does not
justify an inference that the SJC, by recognizing disparate impact
claims in terms of handicap discrimination, intended to transplant
the theory into the age discrimination milieu. It follows that the SJC has not yet staked out a position in regard to the
viability of age discrimination claims grounded in disparate
impact. Because state law is inscrutable in this regard, "it
becomes our duty to vaticinate how the state's highest tribunal
would resolve matters." Moores v. Greenberg, 834 F.2d 1105, 1107
(1st Cir. 1987). In that process, "we may seek inspiration from .
. . analogous state court decisions." Kathios v. General Motors
Corp., 862 F.2d 944, 949 (1st Cir. 1988). Here, we adopt the Cox court's approach. The
Massachusetts age discrimination prohibition and the federal age
discrimination prohibition are substantially identical, compareMass. Gen. Laws, ch. 151B, 4(1B), with 29 U.S.C. 623(a)(1),
and, as said, the public policy concerns implicated by age
discrimination are distinct from the concerns created by other
forms of discrimination. Under these circumstances, we conclude
that, when faced with the question, the SJC likely will look to the
federal courts' interpretation of the ADEA and hold that an age
discrimination claim cannot be grounded solely on a theory of
disparate impact. Accordingly, we sustain the district court's
rejection of the appellant's remaining claim.
III. CONCLUSION We need go no further. Concluding, as we do, that the
lower court appropriately granted summary judgment in Raytheon's
favor on all four of Mullin's statements of claim, we affirm the
judgment below.
Affirmed.